UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| DOROTHEA R. HARDIN, | ) |
| | ) |
| Plaintiff, | ) |
| | )   No. 1:10-CV-235 |
| v. | ) |
| | )   Chief Judge Curtis L. Collier |
| J&S RESTAURANTS, INC., | ) |
| D/B/A HARDEE'S | ) |
| | ) |
| Defendant. | ) |

**M E M O R A N D U M**

In August 2010, Dorothea R. Hardin ("Hardin" or "Plaintiff") filed suit in this Court against

J&S Restaurants, Inc. d/b/a Hardee's ("J&S" or "Defendant") alleging employment discrimination

on the basis of race in violation of 42 U.S.C. § 2000e. Before the Court is Defendant's motion for

summary judgment (Court File No. 13), to which Plaintiff responded (Court File No. 15). Defendant

replied to Plaintiff's response (Court File No. 16). In addition to these pleadings, the Court has

considered deposition testimony, affidavits, and other discovery materials filed by the parties.[1] For

the reasons discussed below, the Court will **GRANT** summary judgment for Defendant.


**I.      FACTUAL & PROCEDURAL BACKGROUND**

---

[1] Defendant moves the Court to consider a supplemental affidavit from Plaintiff's last
immediate supervisor (Court File No. 21) pursuant to E.D. Tenn. L.R. 7.1(d) and Fed. R. Civ. P.
56(e). Although Plaintiff contends the information in the affidavit Defendants seeks to place into
evidence is "cumulative and irrelevant" (Court File No. 25, p. 1), the Court, having reviewed the
affidavit and attached exhibits, concludes an affidavit from Plaintiff's last immediate supervisor in
an employment discrimination claim is both relevant and–because Plaintiff had no other immediate
supervisor–not cumulative. Moreover, the Court understands Defendant had difficulty locating
Plaintiff's former supervisor during the discovery period. Accordingly, the Court **GRANTS**
Defendant's motion to supplement its summary judgment motion (Court File No. 21).

### A. Factual Background

Plaintiff Dorothea R. Hardin, an African-American female, was hired as a Shift Manager at a Hardee's Restaurant located at 2310 East 23rd Street ("23rd Street Hardee's") in Chattanooga, Tennessee. Hardin had worked a number of jobs previous to beginning her employment with Hardee's, and had worked in the food industry before, including a stint managing a shift at a fast food restaurant. According to her testimony, Hardin had never been involuntarily discharged from work before her job with Hardee's.[2] Hardin began her work at the 23rd Street Hardee's on or about June 10, 2008. Upon commencing her job, Hardin received from Rosalind Madden, her supervisor at the 23rd Street Hardee's, an employee handbook outlining Defendant's anti-discrimination and fair treatment policies, as well as the process for reporting any issues or concerns to management.

At the 23rd Street Hardee's, Hardin worked as the Shift Manager from 2 p.m. until 10 p.m. Her responsibilities included overseeing the crew members working at the restaurant, and ensuring the facility was secured and locked at the end of her shift, which was also the time the restaurant closed. While a general silence in the record suggests no significant problems arose between June 2008 and September 2008, Rosalind Madden,[3] who worked as the General Manager at the 23rd Street Hardee's during this time, stated she "reprimanded [Hardin] on several occasions for work performance reasons" (Court File No. 13, ex. 3, Madden Aff., ¶ 4). Hardin indicated she had "no problems with [Madden] ever" (Hardin Depo, p. 53), but expressed concern about Madden's

---

[2] As discussed *infra*, Hardin and Defendant disagree about the facts surrounding the end of her employment with Defendant. In brief, Defendant claims Hardin resigned rather than accept a demotion, and Hardin claims she was forced to quit against her will. *See* Court File No. 13, ex. 1, Hardin Deposition, pp. 192-92 (hereinafter "Hardin Depo").

[3] Madden is African-American.

2

truthfulness in connection with Hardin's later transfer to another location.[4]

On September 18, 2008, Madden reprimanded Hardin in writing for her failure to follow the proper cash handling procedures.[5]  Madden explained in the written reprimand to Hardin that "on today, 9/18/2008, while during a spot check evaluation, your safe was not only found on daylock, but other cash was left out on the safe with the door open" (Court File No. 13, ex. 3, Madden Aff., ¶ 6).  In addition to this written reprimand, Madden also gave Hardin a three-and-a-half page handwritten document memorializing a number of topics Madden discussed with Hardin, including following procedures, the employee meal policy, cleanliness of the store, fraternization, employee/manager relationships, availability, customer awareness, cell phone policy, smoking policy, and time management.  At the end of the document, Madden writes "Dorothea, I expect to see improvement in these areas immediately.  I will reevaluate you in two weeks 10/1/08.  If improvements not noted, we will discuss further disciplinary action up to and including demotion with a cut in pay" (Court File No. 13, ex. 2 to ex. 3, p. 4).  Beneath these two sentences, Hardin signed acknowledging she had received the reprimand and understood it.  In her deposition, Hardin indicated she did not remember the incident involving improper handling of cash (Hardin Depo., pp. 61-62), but did remember reviewing and signing the three-and-a-half page document given to her

---

[4] In her deposition, Hardin noted at the time she was transferred out of the 23rd Street Hardee's in September 2008, Madden did not explain the basis for Hardin's transfer. Hardin claims she spoke with Madden at some later point, and Madden explained Hardin had been transferred to a Hardee's in East Ridge from which she could be discharged (Hardin Depo., pp. 54-55).  In her affidavit, Madden makes no reference to any discussion with Hardin regarding her transfer, and instead states "[t]he decision to transfer Ms. Hardin was based on the legitimate business and staffing needs of the store and was not based on race" (Court File No. 13, ex. 3, Madden Aff., ¶ 9).

[5] On this and all written reprimands Hardin signed is the sentence "I hereby acknowledge receipt of the above reprimand and understand that if I repeat this offense I will be terminated."

3

by Madden (*id.* at p. 63). Hardin suggested the document resulted from an incident in which she was inappropriately "kidding around" with a biscuit maker (*id.* at 64-65).

On September 29, 2008, eleven days after Hardin had received the written reprimand and the handwritten document, she was transferred from the 23rd Street Hardee's to a Hardee's restaurant located in the East Ridge, Tennessee ("East Ridge Hardee's"). At the time of the transfer, Hardin did not know why she was being transferred (Hardin Depo., p. 58); subsequently she alleged her transfer was simply a prelude to her inevitable termination (*id.* at 54-55). Madden in her affidavit explained Hardin was transferred to accommodate staffing needs (Court File No. 13, ex. 3, Madden Aff., ¶ 9). The record includes a State of Tennessee Department of Labor and Workforce Development Separation Notice dated on September 29, 2008 and signed by Madden indicating Hardin was being transferred to the East Ridge Hardee's. No explanation for her transfer is provided in the Separation Notice.

At the East Ridge Hardee's, Hardin continued to work as the Shift Manager for the 2:00 p.m. to 10:00 p.m. shift, and had the same responsibilities she previously held at the 23rd Street Hardee's. Hardin immediately observed that whereas the clientele at the 23rd Street Hardee's was mostly black, the customers at the East Ridge Hardee's were predominantly white (Hardin Depo., p. 75). Hardin's supervisor at the time of her transfer to the East Ridge Hardee's was General Manager Thomas Sales, who is African-American. Just over a month after her transfer, Sales issued a written reprimand to Hardin. Dated November 8, 2008, Sales reprimanded Hardin for failing to lock the drive-thru door, and informed her in the reprimand "[i]f this happens again or any other security matters you will be terminated" (Hardin Depo., ex. 14). Four days later, on November 12, 2008, Sales issued Hardin another reprimand, this time for leaving the front door unlocked. Sales again

4

cautioned Hardin as follows: "If this happens again or any other security matters are not being meet [sic] you will be 'automatic [sic] terminated'" (Hardin Depo., ex. 15).[6]  In addition to these reprimands, Hardin noted at her deposition she was subject to disciplinary actions "practically every other day" (Hardin Depo., p. 96).

Responding at her deposition to questions about the two November reprimands and some of the other disciplinary actions, Hardin testified Sales uncritically accepted allegations Hardin left the doors unlocked (or committed other work infractions) made by Marie Woods, who also worked as a Shift Manager, typically for the morning shift.  In Hardin's account, although Woods was only, like Hardin herself, a Shift Manager, "from the day [Hardin] started up [at the East Ridge Hardee's], [Woods] . . . was controlling" and "would try to be more like the manager of the store" (*id.* at 81). Hardin grew frustrated when Sales repeatedly took Woods's word over her own (*id.* at 84).  Hardin made clear, however, the tension between her and Woods, and occasionally between her and Sales, was not related to race:

> Q: You don't feel like that was racially motivated do you?  I mean, you all were all three black, right?
> A: I think that was a little personal on their part.
> Q: Just a personality issue . . .
> A: No.
> Q. . . . but not because of race, obviously?
> A: Personal.
> Q: Okay, but would you agree with me that that part wasn't racially–
> A: Yes, I would agree to that.  That was not . . . racial.[7]

(*id.* at 83-84).  In an affidavit, Sales, who transferred away from the East Ridge Hardee's for reasons

---

[6] Hardin signed acknowledging she received and understood the reprimands, but testified in her deposition she signed out of a fear of losing her job (Hardin Depo., p. 100).

[7] Hardin attributed much of the constant criticism of her work to Woods, who was employed at the East Ridge Hardee's until about a month before Hardin's employment ended.

5

unrelated to Hardin in mid-March 2009, echoed Hardin's assessment: "I am black and understand Ms. Hardin claims she was discriminated against on the basis of her race, which is also black. The reprimands I gave Ms. Hardin were not based on her race, but were based on the security issues described in the Reprimands" (Court File No. 3, ex. 2, Sales Aff., ¶ 9).

After Sales transferred out of the East Ridge Hardee's, Brenda Amyx, who is white, replaced him as the General Manager. Generally, Hardin noted she had no problems with Amyx (Hardin Depo., p. 105). On April 17, 2009, about a month after Amyx began as General Manager of the East Ridge Hardee's, she reprimanded Hardin (all errors sic): "Job performance on 4/17/09 District Manager and head of training was in store Dorothea Continued to lay on counter in thier way. not doing any of her work as the M.O.D. Also did not run reports as directed by the District Manager" (Court File No. 21, ex. 1 to Amyx Aff.). Hardin signed the written reprimand, but in her deposition Hardin vigorously contended she was not the individual lying on the counter (Hardin Depo., pp. 107-09).

On the same date, Amyx and the Regional Manager, Mike Hawkins, performed an evaluation of Hardin (Court File No. 13, ex. 2 to Hawkins Aff.). The single page evaluation form required the assessors to evaluate Hardin across five categories: arrival and entryway door, drive-thru, front counter and backline, dining room, and miscellaneous. In each category, the assessors answer a series of yes/no/not applicable questions, and then a space is provided for narrative comments. At the bottom of the form, two lines are available for "additional comments," and the assessed individual is scored.[8] The score an evaluated individual receives results from subtracting the number

---

[8] Comments made on Hardin's evaluation reflected both positive and negative feedback.

of "no" responses from the total possible points.[9]  In Hardin's case, she received 22 out of a possible 29 points, for a resulting percent score of 75.9%.  According to the scoring measures at the bottom of the form, an individual scoring between 90% and 100% "exceeds standards," one scoring between 80% and 90% "meets standards," and one scoring below 80% "does not meet standards."  Hardin's score placed her in this last category.  Although Hardin, who was shown this evaluation and received a copy of it upon request, testified she believed she was "doing a pretty good job" (Hardin Depo., p. 186), she agreed that an assessment indicating her work "does not meet standards" did not suggest she was doing a good job (*id.* at 185).

The next relevant event occurred on May 25, 2009.  On that date, Hardin was filling in for the morning Shift Manager, and, according to Hardin, she found only two boxes of sausages,[10] which would not be enough to manage the morning breakfast crowd.  Hardin claims she then called Amyx to inform her of the situation, and Amyx told Hardin to request additional boxes from another location.  Hardin took some umbrage at Amyx's suggestion, apparently, as Hardin believed Amyx, who had worked the evening before and served as the General Manager, should have already addressed the shortage.  Amyx set out her view of what happened in an extensive written reprimand (all errors sic):

> Job performance.  On 5/25/09 Dorothea called me saying we didn't have enough Biscuit mix.  I told her to call and find some 10 min later I called back and ask if she found any was told yes everything was fine.  When I called at 11 am to ask if everything was ok She said yes they ran out of biscuits at about 5 or 10 til 11 am.  Crew and customers told me She stopped at 10:20 am because she was out of biscuits She had not sent after any.  also told me she was yelling and being rude to crew.

---

[9] The total possible points result from the number of total points less the number of "not applicable" responses.

[10] Hardin claims the shortage concerned sausages while Amyx remembered it to be biscuits.

7

> When I got here at 11:45 am everyone was still on the clock with no cleanup done labor was at 25.93%. no control over shift at all. Customers told me they had to wait a very long time and some said they just left because they couldn't get waited on.
>
> Crew members have told me they will not work for her. also a few breaks not given. I was told all breaks had been given by Dorothea herself, then found out different. I called to check on her she said everything was going good so in my opinion she falsified information to me at least twice that day.

(Court File No. 21, ex. 3 to Amyx Aff.). Hardin signed the document, apparently on the same day it was issued (May 25, 2009), but subsequently added a brief note on June 2, 2009: "I signed this, but I *do not* agree with everyone on here" (*id.*) (emphasis in original). In her deposition, Hardin testified: 1) there were only two customers who had to wait, and she gave each of them orange juice to thank them for their patience; 2) she did not yell at all; and 3) all breaks were given as required.

Three days later, on May 28, 2009, Hardin received what would be her final reprimand. Before issuing the reprimand, Amyx contacted Hawkins, the Regional Manager, on May 29 to inform him Hardin had left the front door of the East Ridge Hardee's unlocked the previous day. Hawkins and Amyx decided to meet with Hardin to discuss the reprimand and a demotion for her to a crew member position.

The reprimand form includes two different sets of handwriting and is witnessed by both Amyx and Hawkins. In Amyx's handwriting is the underlying reprimand: "Leaving front door unlocked a safety hazard which has been broken on two other occasions reprimands on file" (Court File No. 21, ex. 5). Directly after this entry in handwriting identified by Harden at her deposition as Hawkins's was the following comment: "Dorothea, this is a very serious security hazard, which has been discussed with you on 2 other occasions. You will be demoted to crew member effective 6/2/2009. Dorothea refused demotion and resigned effective 6/2/09" (*id.*). At the bottom of the

8

reprimand form, Hardin wrote "I signed this and I *do not* wish to be demoted to crew because I was hired in as manager and *do not* wish to start over as crew" (*id.*) (emphasis in original).

There is some disagreement regarding what transpired at the meeting between Hardin, Amyx, and Hawkins. According to Amyx and Hawkins, Hardin was offered a demotion to a crew member position at the same salary, but refused (Court File No. 13, Hawkins Aff., ¶¶ 8-11; Court File No. 21, Amyx Aff., ¶ 6). This version of events is consistent with the short note Hardin appended to the reprimand for the May 28, 2009 incident, and with the description on the Separation Notice. Hardin contends, however, she did not mind a demotion, but objected to a transfer Hawkins had proposed (Hardin Depo., p. 123). Hardin testified Hawkins had told her she would be demoted and transferred, and if she refused, Hawkins would nonetheless write down she had resigned. All parties agree Hardin made no reference to race or racial discrimination at the time her employment with Defendant terminated. Additionally, there is no dispute Hardin never sought to pursue a complaint through the procedure laid out in the employee handbook she received upon commencing her work (*id.* at pp. 50-52).

The two individuals responsible for the decision to demote Hardin, and then eventually accept her resignation, state in affidavits her resignation was related not to her race but to her shortcomings on the job. Hawkins explained: "The decision to demote Ms. Hardin to a non-managerial position was not based on race, but was based on her poor performance as a shift manager. After repeated reprimands concerning job performance, it was evident Ms. Harden was not suited for a management position" (Court File No. 13, Hawkins Aff., ¶ 10). Similarly, Amyx indicated "[m]y write-ups and reprimands to Ms. Hardin were not based on Ms. Hardin's race but were based on her overall poor performance and uncooperative attitude" (Court File No. 21, Amyx

Aff., ¶ 5). Although not involved in Hardin's discharge, Sales's affidavit echoes these sentiments: "I am black and I understand Ms. Harden claims she was discriminated against on the basis of her race, which is also black. The reprimands I gave Ms. Hardin were not based on her race, but were based on the security issues described in the Reprimands" (Court File No. 13, Sales Aff., ¶ 9).

In making her race-based employment discrimination claim, Hardin relies on two additional factual assertions. First, she indicates she heard discussion of a need to "whiten up" the East Ridge Hardee's by discharging black employees and hiring white employees. Beyond rumors circulating among crew members, Hardin testified Sales, while he was still the General Manager at the East Ridge Hardee's, informed employees at a staff meeting of an effort to "whiten up this store" (*id.* at p. 148). Hardin also alleges she overheard a conversation between Sales and Hawkins in which Hawkins instructed Sales to stop hiring black employees and to instead hire white employees (*id.* at p. 2; Hardin Depo., p. 154). Although Hardin was offended by these statements and spoke directly to Sales later, she did not report these statement to anyone.[12] Amyx stated in her affidavit she was "not aware of anyone at J&S saying anything about 'whitening up' the Store. I have never heard Mike Hawkins or anyone else at J&S make this alleged comment" (Court File No. 21, Amyx Aff., ¶ 5).

Second, Hardin's complaint asserts "[i]n the months immediately prior to [her] termination approximately eight (8) African Americans were fired from Defendant's East Ridge Store without cause" (Court File No. 2, Complaint, ¶ VII). When asked about these former employees during her deposition, Hardin could only remember four individuals, and she admitted that in three of the cases

---

[12] Hardin did claim she had typed up everything she had heard when she returned from work. She testified she then gave it to her lawyer (Hardin Depo., p. 155). None of these notes, however, has been made a part of the record.

she did not know the reasons for their termination, and in the fourth case, the individual was discharged because she was a slow worker. In an affidavit filed in response to Defendant's summary judgment motion, Hardin again asserts that "approximately 8 African Americans were fired from the East Ridge store for no apparent cause" (Court File No. 15, Hardin Aff., p. 2). In its reply brief, Defendant includes an affidavit from Mike Hawkins which indicates a total of 54 employees were terminated (quit or discharged) in 2009 from the East Ridge Hardee's; 28 were white, 20 were black, and the remaining six did not indicate a race on their work application (Court File No. 16, Hawkins Aff., ¶ 3). Using the names of the black employees allegedly discharged without cause provided by Hardin in her deposition, Hawkins states only one of the four names given referred to a person actually employed, Erica, and both individuals named Erica quit.

### B. Procedural Background

Hardin filed a timely charge with the Equal Employment Opportunity Commission ("EEOC") in December 2009. On May 25, 2010, she received a Dismissal and Notice of Rights from EEOC which permitted Hardin to file suit against Defendant within 90 days. Hardin did so, filing her complaint in this Court on August 20, 2010. After the close of discovery on January 13, 2012, Defendant filed a motion for summary judgment (Court File No. 13), to which Hardin responded (Court File No. 15). Defendant replied to Hardin's response (Court File No. 16).

## II. STANDARD OF REVIEW

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating no genuine issue of material fact exists.

11

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003). The Court should view the evidence, including all reasonable inferences, in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

To survive a motion for summary judgment, "the non-moving party must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial." *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). Indeed, a "[plaintiff] is not entitled to a trial on the basis of mere allegations." *Smith v. City of Chattanooga*, No. 1:08-cv-63, 2009 WL 3762961, at *2-3 (E.D. Tenn. Nov. 4, 2009) (explaining the Court must determine whether "the record contains sufficient facts and admissible evidence from which a rational jury could reasonably find in favor of [the] plaintiff"). In addition, should the non-moving party fail to provide evidence to support an essential element of its case, the movant can meet its burden of demonstrating no genuine issue of material fact exists by pointing out such failure to the court. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).

At summary judgment, the Court's role is limited to determining whether the case contains sufficient evidence from which a jury could reasonably find for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). If the Court concludes a fair-minded jury could not return a verdict in favor of the non-movant based on the record, the Court should grant summary judgment. *Id.* at 251-52; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

## III. ANALYSIS

Hardin contends Defendant discriminated against her by discharging her because of her race in violation of federal anti-discrimination law. Title VII of the Civil Rights Act of 1964 prohibits an employer from "discharg[ing] any individual . . . because of such individual's race. . . ." 42 U.S.C. § 2000e (a)(1). To establish racial discrimination in a Title VII employment discrimination action, a plaintiff must show a violation by either direct or indirect–circumstantial–evidence. *Romans v. Michigan Dep't of Human Serv.*, 668 F.3d 826, 835 (6th Cir. 2012). Here, Hardin has not identified whether she relies on direct or circumstantial evidence in her claim, so the Court first considers the type of evidence before it. After determining Hardin has presented circumstantial evidence, the Court considers Hardin's claim under the burden-shifting analysis first established in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973). Ultimately, the Court concludes Hardin has neither proved a *prima facie* case nor–even if she had satisfied the *prima facie* case–is she able to establish Defendant's non-discriminatory reason for her termination was pretextual.

A.    **Direct Evidence of Discrimination**

Direct evidence of racial discrimination "does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group." *Johnson v. Kroger*, 319 F.3d 858, 865 (6th Cir. 2003) (citing *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir.2000); *cf. Minadeo v. ICI Paints*, 398 F.3d 751, 763 (6th Cir. 2005) ("Direct evidence is evidence that proves the existence of a fact without requiring any inferences.") (quoting *Rowan v. Lockheed Martin Energy Sys.*, 360 F.3d 544, 548 (6th Cir. 2004)). Statements not made by decisionmakers, or statements made by decisionmakers "unrelated to the decisional process itself cannot suffice to satisfy the plaintiff's burden" as direct evidence. *Geiger v. Tower Auto.*, 579 F.3d 614, 621 (6th Cir. 2009) (quoting *Bush*

13

*v. Dictaphone Corp.*, 161 F.3d 363, 369 (6th Cir. 1998)) (internal alterations omitted). Although *Geiger* was interpreting the Age Discrimination in Employment Act, 29 U.S.C §§ 623 *et seq*., the same analysis applies under Title VII cases, *see McDonald v. Union Camp Corp*., 898 F.2d 1155, 1161 (6th Cir.1990); *Taylor v. Bd. of Educ. of Memphis City Schools*, 240 F. App'x 717, 720 (6th Cir. 2007) ("Isolated remarks by individuals 'with no managerial authority over the challenged personnel decisions' ordinarily are not indicative of discrimination.") (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 354 (6th Cir.1998)). By contrast, however, where someone with the ultimate authority to make an employment decision makes statements indicating maintaining racial balance is relevant to that employment decision, unlawful discrimination may be a motivating factor. *Taylor*, 240 F.App'x at 720. Finally, in addition to being made by a decisionmaker as part of the decisional process, a statement–to constitute direct evidence–must clearly evince the intent of discriminating on the basis of race. *Cf. Scott v. Potter*, 182 F. App'x. 521, 526 (6th Cir. 2006) ("'Only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of age,' satisfy this criteria.") (quoting *Carter v. City of Miami*, 870 F.2d 578, 582 (11th Cir. 1989).

    Although not clearly argued, Hardin's response to Defendant's motion for summary suggests she relies in part, if not entirely, on a direct evidence theory. After denying she resigned and claiming she was fired against her will, Hardin asserts "[s]he was told *directly* from the store manager that he was expected by his superiors to 'whiten up the store'" (Court File No. 15, p. 1) (emphasis added). She also notes she had overheard Hawkins, the Regional Manager, instruct Sales, one of the General Managers at the East Ridge Hardee's while Hardin worked there, to "whiten up the store." Although Hardin offers no evidence other than her own statements in a deposition

14

Case 1:10-cv-00235   Document 30   Filed 05/02/12   Page 14 of 25   PageID #: 444

(echoed in her affidavit attached to her response to Defendant's summary judgment motion), and although Amyx claimed she never heard or was aware of any instruction to "whiten up the store,"[13] the Court will construe these statements as true for the purpose of deciding the summary judgment motion.

Even assuming Sales did directly tell Hardin he was expected by his superiors to "whiten up" the East Ridge Hardee's, whether in a staff meeting or otherwise, such a statement does not constitute direct evidence of unlawful discrimination because Sales was not involved in the decision to terminate Hardin. Sales served as the General Manager of the East Ridge Hardee's at the time Hardin transferred to that location at the end of September 2008, and, in that capacity, Sales did have the authority to discharge Hardin. Sales twice reprimanded Hardin in November 2008 for her failure to lock doors during the closing of the restaurant and indicated on both Reprimand forms that a repeat offense would be grounds for termination. But Sales transferred out of the East Ridge Hardee's at some point in March 2009. Hardin's employment did not end until June 2009. Accordingly, Sales was not a decisionmaker at the time Hardin's continued employment at Hardee's was considered, *see McDonald*, 898 F.2d at 1161, and thus any statement he made cannot constitute direct evidence of discrimination.

Although it is a closer call, Hawkins's alleged communication to Sales–overheard by Hardin–at some point before Sales transferred out of the East Ridge Hardee's in March 2009 to "whiten up the store" is also not direct evidence of discrimination. Unlike Sales, Hawkins did have the authority to terminate Hardin at the time of her discharge, and the record indicates both Hawkins

---

[13] In their affidavits, neither Hawkins nor Sales make any reference to an alleged policy or alleged statements to "whiten up the store."

and Amyx were involved in making the decision to demote Hardin–an offer that eventually resulted in Hardin's discontinuing her employment.[14] Moreover, "remarks by any official who played a 'meaningful role' in the employment decision or 'may have influenced the decision' *may* constitute direct evidence of discrimination." *Taylor*, 240 F. App'x at 720 (quoting *Ercegovich*, 154 F.3d at 355) (emphasis added). No decision by the United States Court of Appeals for the Sixth Circuit appears to have further elucidated precisely how a court should analyze whether a given remark does or does not constitute direct evidence, but the Sixth Circuit has set out factors for assessing more generally whether statements amount to discrimination:

> (1) whether the statements were made by a decision-maker or by an agent within the scope of his employment; (2) whether the statements were related to the decision-making process; (3) whether the statements were more than merely vague, ambiguous or isolated remarks; and (4) whether they were made proximate in time to the act of termination.

*Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 477-78 (6th Cir. 2002). Applying these factors to Hawkins's alleged statement to Sales at some point before March 2009 that Sales should attempt to "whiten up" the East Ridge Hardee's, the Court concludes that comment does not constitute direct evidence of discrimination.

Although the first factor tends to support considering the statement as direct evidence, the three other factors strongly tend in the opposite direction. The first factor weighs in Hardin's favor: Hawkins was a decisionmaker at the time he allegedly made the statement (whenever it was), and remained a decisionmaker at the time Hardin suffered her adverse employment action. The second factor, however, does not. There is no suggestion the statement Hawkins made was in the context

---

[14] As discussed below, the Court, construing the disputed facts surrounding whether Hardin resigned or was terminated in a light most favorable to Hardin, concludes she suffered an adverse employment action even if she did ultimately resign.

of an employment decision about Hardin, or any other employee. Moreover, Hawkins allegedly made the statement to Sales, who had the authority at the time to terminate Hardin, but did not do so, and never did so before leaving the East Ridge Hardee's. Thus, the statement cannot be said to have been "related to the decisionmaking process." The third factor also cuts against Hardin: the alleged statement to "whiten up the store" is vague, and because Hardin only alleges she heard it from Hawkins once, it is also isolated. To get from "whiten up the store" to "terminate black employees and hire white employees" requires inferential steps–precisely what direct evidence should not require. *Kroger*, 319 F.3d at 865. Even assuming Hawkins was discussing race, and not a paint job, one might conclude he was, however distastefully, discussing clientele. Even if Hawkins was discussing employees, another inferential step is required to assume Hawkins is advocating a policy of hiring more white employees and firing more black employees. Moreover, it is telling that Amyx, who replaced Sales as the East Ridge Hardee's General Manager, never heard such a statement nor was aware of any such policy. Simply put, the statement is both too vague and too isolated to constitute direct evidence. Finally, the fourth factor–whether the statement was proximate in time to the act of termination–supports finding the statement was not direct evidence. Although Hardin does not identify when she heard it, the statement could have been made at the latest in March 2009, three months before her termination. As noted, Amyx was not aware of any statement or policy to "whiten up the store," suggesting no statement was made closer to the time Hardin discontinued her employment. Taken together, these factors compel the conclusion that Hawkins's statement to Sales to "whiten up" the East Ridge Hardee's does not constitute direct evidence of discrimination on the basis of race as related to her employment action.

### B. Circumstantial Evidence of Discrimination

17

Because Hardin is unable to show direct evidence of race discrimination, she must satisfy the *McDonnell-Douglas* burden shifting analysis for circumstantial evidence. To make out a *prima facie* case for discrimination under federal law, a plaintiff must demonstrate 1) she is a member of a protected class; 2) she was qualified to perform the work; 3) despite her qualifications, she suffered an adverse employment action; and 4) she was replaced by someone outside the protected class or treated differently than similarly-situated members of the unprotected class. *Umani v. Michigan Dep't of Corrections*, 432 F. App'x 453, 460 (6th Cir. 2011). Once the plaintiff establishes a *prima facie* case, the burden of production–but not the burden of persuasion–shifts to the defendant to articulate a nondiscriminatory reason for the adverse employment action. *Harris v. Metro. Gov't of Nashville and Davidson Cnty.*, 594 F.3d 476, 485 (6th Cir. 2010). When the defendant makes this showing, the burden of production shifts back to the plaintiff to show the defendant's proffered reasons was "mere pretext for intentional . . . discrimination." *Id.*

There is no dispute Hardin is a member of the protected class; Defendant challenges the three other prongs. Specifically, Defendant contends 1) Hardin did not suffer an adverse employment action because she resigned; 2) Hardin's numerous reprimands and subpar performance evaluation indicate she was not qualified to perform the work; and 3) the evidence does not establish Hardin was treated less favorably than non-protected employees because of her race. The Court finds merit in two of these three arguments, and concludes Hardin has failed to established a *prima facie* case of race discrimination because she cannot show she was qualified to perform the work or that she was treated differently than similarly-situated members of the unprotected class.

Defendant first argues Hardin did not suffer an adverse employment action because she affirmatively chose to resign instead of being fired. The record, however, is simply unclear on this

18

point, as some confusion remains whether Hardin would or would not accept a demotion but not a transfer.[15] Even taking Defendant's view–that Hardin resigned after refusing to accept a demotion to a crew member–Hardin would have suffered a sufficiently materially adverse employment change. *See Kocsis v. Multi-Care Mgmt.*, 97 F.3d 876, 886 (material adverse factors include "termination of employment, a demotion evidenced by a decrease in wage or salary, *a less distinguished title*, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation") (emphasis added). Because being a crew member is less distinguished than a Shift Manager, the demotion Hardin would have had to accept to stay on would have constituted an adverse employment action. Given the procedural posture, however, the Court will not seek to resolve the uncertainty surrounding the end of Hardin's employment, but instead view the disputed evidence in a light most favorable to Hardin. Viewed in this way, Hardin suffered an adverse employment action. Thus, she satisfies this prong of the *prima facie* case.

Defendant next contends Hardin's *prima facie* case falls short because she was not qualified to perform her work. An employee is qualified to do his job if "he was doing his job well enough to meet his employer's legitimate expectations and was performing to the employer's satisfaction." *Dews v. A.B. Dick. Co.*, 231 F.3d 1016, 1022 (6th Cir. 2000) (citing *Warfield v. Lebanon Corr. Inst.*, 181 F.3d 723, 729 (6th Cir.1999)). Where an employer "consistently lauds" an employee and retains him even while otherwise downsizing, there is a genuine issue of material fact regarding whether that employee is qualified to perform the work. *Id.* By contrast, where an employment

---

[15] In its summary judgment motion, Defendant avers Hardin is simply confused about the possibility of a transfer, and notes the absence of any evidence suggesting Hardin was slated for a transfer (Court File No. 14, p. 15).

discrimination plaintiff fails to offer any evidence she was qualified to perform the work, summary judgment for the employer is proper. Finally, merely challenging an employer's judgment regarding the quality of work performed is inadequate to raise a material issue of fact on this prong. *McDonald*, 898 F.2d at 1160.

Here, Defendant points to considerable evidence in the record indicating Hardin failed to meet its legitimate expectations, and therefore was not qualified to perform her job as a Shift Manager. First, Hardin received an evaluation on April 17, 2009 which scored her performance as "does not meet standards" (Court File No. 13, ex. 2 to Hawkins Aff.). This evaluation was based on a numerical grading of Hardin's work assessed across a number of categories. Second, Defendant identifies six reprimands Hardin received for inadequate job performance. Beginning in November 2008 and continuing until the end of May 2009, Hardin was reprimanded for improper cash handling procedures (leaving the safe unlocked), leaving doors unlocked, lying on the counter, failing to run reports, and general job performance issues. The final reprimand on May 28, 2009 that precipitated the end of her employment with Defendant was the third time she had been reprimanded for leaving a door unlocked. Thus, the record strongly indicates Hardin was not qualified to perform her job.

Moreover, Hardin offers no evidence suggesting a contrary conclusion. Instead, she takes issue with how her work was characterized by Madden, Sales, Amyx, and Hawkins. She additionally claims in an affidavit submitted with her response to Defendant's summary judgment motion she does not remember signing the September 18, 2008 reprimand (Court File No. 15, Hardin Aff., p. 2). In her deposition, however, she recalled the three-and-a-half page handwritten letter she received the same date from Madden outlining a number of areas where her performance

needed improving (Hardin Depo., pp. 61-63). Rather than offer any affirmative evidence suggesting she was qualified to perform her job, Hardin relies only on challenging (some of) the numerous judgments made by four different supervisors over the course of her time working for Defendant indicating she was performing inadequately. Because failing to advance any evidence of qualifications and resting only on challenges to an employer's judgment is insufficient to create a genuine issue of material fact, *McDonald*, 898 F.2d at 1160, the Court concludes Hardin has failed to satisfy this prong of the *prima facie* case. Accordingly, summary judgment is proper.

Hardin also fails to satisfy the final prong of the *prima facie* case, namely, that she was treated differently than similarly-situated members of the unprotected class.[16] Hardin's complaint alleges Defendant discharged eight black employees in the months prior to her own termination. At her deposition, however, Hardin could recall the names of only four employees who left, and in three cases Hardin admitted she did not know any of the circumstances explaining why they left employment.[17] While this failure might be ascribed to a memory lapse while being deposed, the same cannot be said for the affidavit Hardin submitted along with her response to Defendant's summary judgment motion. In that affidavit, Hardin again simply alleges "approximately 8 African Americans were fired by the defendant" in the months preceding June 2009 (Court File No. 15, Hardin Aff., p. 2), and provides no support for this allegation. By contrast, Defendant attaches an

---

[16] A plaintiff can satisfy this prong by showing she was either replaced by or treated differently than similarly-situated members of the unprotected class. Because neither party submitted evidence concerning whether Hardin was replaced and if so, by whom, the Court limits its consideration to whether Hardin was treated differently than any similarly-situated individuals from the unprotected class.

[17] In the fourth case, Hardin noted the employee was discharged because she worked too slowly.

21

affidavit from Hawkins in its reply to Hardin's response indicating a total of 54 employees were terminated (quit or discharged) in 2009 from the East Ridge Hardee's; 28 were white, 20 were black, and the remaining six did not indicate a race on their work application (Court File No. 16, Hawkins Aff., ¶ 3). Using the names of the black employees allegedly discharged without cause provided by Hardin in her deposition, Hawkins states only one of the four names given referred to a person actually employed, Erica, and both individuals named Erica quit. Because mere allegations are not enough to survive a summary judgment motion, *Smith*, 2009 WL 3762961, at *2-3, the Court does not credit Hardin's unsupported assertions as constituting evidence she was treated differently than similarly-situated members of the unprotected class.[18] Accordingly, Hardin has failed to meet this prong of the *prima facie* case, which further justifies summary judgment for Defendant.

Because Hardin has failed to establish she was qualified for her work and that she was treated differently than similarly-situated individuals in the unprotected class, she has not made out a *prima facie* case for employment discrimination. Accordingly, summary judgment for Defendant is proper.

## C.     Pretext

Even if Hardin's failure to establish a *prima facie* case for employment discrimination did not require dismissal, summary judgment would be appropriate because of her failure to show

---

[18] Two other pieces of evidence warrant brief consideration. First, Hardin claimed in her deposition white employees with tattoos were not asked to cover them up, while black employees were (Hardin Depo., pp.159-63). But as Hardin further noted, whether to enforce an informal policy regarding covering up tattoos was in the hands of shift leaders like her, and Hardin herself never faced any disparate treatment on this basis. Second, when asked whether any white employees had left doors unlocked but not been reprimanded, Hardin claimed she was the only one who had been accused (*id.* at 198). Hardin then testified another employee had left the door unlocked but was not reprimanded, but that this employee was black (*id.*).

Defendant's basis for discharging her was pretextual.  *Cf. Romans*, 558 F.3d at 838-39 (finding plaintiff did not establish *prima facie* case and then finding plaintiff failed to show the defendant's asserted legitimate, non-discriminatory reason for terminating plaintiff was pretextual).  There is no dispute Defendant has carried its burden of offering a legitimate, non-discriminatory reason for discharging Hardin: Defendant sought to demote Hardin for failure to perform her job duties adequately.[19]  Thus, the burden of production then shifts back to Hardin to demonstrate this facially nondiscriminatory reason in fact masks discriminatory animus.[20]  To establish the employer's stated reason for the termination was pretextual, a plaintiff must show it "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action."  *Id.* at 839 (quoting *Chen v. Dow Chemical Co.*, 580 F.3d 394, 400 (6th Cir.2009)).

The first avenue of establishing pretext is generally available when a plaintiff can show the reasons for the employer's actions were factually false.  *See Johnson v. Interstate Brands Corp.*, 351 Fed.App'x. 36, 41 (6th Cir. 2009); *see also Romans*, 558 F.3d at 839 ) ("[T]he key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse action.") (citations omitted).  Hardin makes no argument Defendant's reason for discharging her was factually false.  Moreover, Hardin's unsatisfactory evaluation and the six reprimands she received before she was discharged indicate Defendant did not act without a basis in fact.  That Hawkins and

---

[19] As already discussed, the parties dispute whether Defendant actually discharged Hardin, or Hardin resigned after rejecting a demotion to crew with the same pay.  Construing the evidence in the light most favorable to Hardin, the Court will assume she was in fact discharged.

[20] At this point in the analysis, "the burden of producing evidence of 'pretext' essentially merges with the burden of persuasion, which always lies with the plaintiff."  *Gragg v. Somersett Technical Coll.*, 373 F.3d 763, 768 (6th Cir. 2004) (citation omitted).

23

Amyx met to discuss Hardin's case before approaching her to address her May 28, 2009 reprimand for again leaving a door unlocked demonstrate Defendant made a reasonably informed and considered decision before terminating Hardin.

The second avenue to establishing pretext is available to a plaintiff "by showing circumstances which tend to prove that an illegal motivation was more likely than that offered by the defendant." *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir.1994), *overruled on other grounds*, *Geiger v. Tower Auto.*, 579 F.3d 614 (6th Cir.2009). Although Hardin makes no specific argument on this point, her reference to the eight black employees allegedly terminated in the months immediately prior to her own termination would, if supported by evidence, tend to show an illegal motivation more likely explained her termination than the job performance rationale given by Defendant. As already discussed, however, Hardin fails to support her assertion with any evidence, and the evidence offered by Defendant in its reply to Hardin's response significantly undercuts Hardin's allegation. Accordingly, this avenue for showing pretext is not open for Hardin.

To show a stated reason for discharge was in fact insufficient to warrant the discharge–the third and final avenue to making out a pretext claim–the plaintiff must typically provide "evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff." *Manzer*, 29 F.3d at 1084. Hardin does not make any argument along these lines. Nothing on the record indicates other employees, whether in the protected class or not, were consistently engaging in conduct similar to Hardin's, but were not discharged or otherwise reprimanded. Thus Hardin cannot demonstrate pretext on this basis.

24

Because Hardin has neither established a *prima facie* case of employment discrimination nor rebutted Defendant's legitimate, non-discriminatory reason for her termination, summary judgment for Defendant on Hardin's race discrimination claim is appropriate.

**IV.    CONCLUSION**

For the reasons discussed above, the Court will **GRANT** Defendant's motion for summary judgment (Court File No. 13).  There being no other issues in this case, the Court will **DIRECT** the Clerk of Court to **CLOSE** this case.

An Order shall enter.


**/s/**_____
**CURTIS L. COLLIER**
**CHIEF UNITED STATES DISTRICT JUDGE**